We have before us today a continuation of the proceedings and 22-6086 White Monkee Productions v. Netflix. This is subject to the panel re-hearing that you, the Council, are certainly aware of. As indicated in our most recent order, APOE will begin first and then we will continue on. So if you will make your appearance and proceed, please. Good morning, Your Honor. It's Robert Rothstein for the Apolese. May I raise the volume? I'm having a little trouble hearing him. I can hear everyone else well. Is that any better, Your Honor? Well, we'll make do. At the outset, I'd like to thank the Court for continuing the dialogue in this case, which truly is highly significant to copyright law. May it please the Court, three elements established that the first fair use factor weighs heavily in favor of fair use in this case. First, there's the decades-long authority addressing the use of film clips and documentaries, and in accordance with that authority, the use in this case was highly transformative, indeed, a favored preamble use. Second, the narrow and limited holding in Warhol doesn't change this. Specifically, Warhol doesn't require targeting and it's distinguishable on its facts. And third, the fact that the documentary was commercially streamed does, in that way, its highly transformative nature. The key question in looking at commerciality in the Warhol is substitution, and the documentary about the Tiger King and his dark world and big cats couldn't conceivably substitute for a video in loving memory of a friend's funeral. So with that, I'll turn to the first point. Well, and I have plenty of questions for you, Mr. Rothstein. So indeed, let's begin with the first point. And one question I would ask you in that connection is, at the end of the day, does it really matter whether this is deemed to be a preamble purpose or not? I mean, in Harper and Row, the court made it very clear that there's no talismanic effect associated with something being a preamble purpose or not. It's not presumptively fair use. And it's just a list of examples of things that courts and Congress have deemed to be circumstances that are most often, well, often found to be fair use. So does it really matter, ultimately? Well, Your Honor, first of all, the use is highly transformative. So preamble or not, it remains highly transformative. So I don't think it matters in that regard. I think it to the extent that these uses are favored. Warhol said their favorite falls within the example that Congress thought was a transformative use. So... Well, where is this word favored that you're talking about? I mean, I read recently again, Harper and Row and Warhol, they don't use that word favored. In fact, they speak of the notion that these are examples that Congress and courts have found in the circumstances to be fair use. I mean, that's all I get out of those cases. Where's the favored notion come from? Fair enough, Your Honor, but the examples matter. Congress thought that calling these examples to the attention of courts mattered and our use falls within those examples, squarely within those examples. It's preamble use or not, use of a film clip in a biography or in a history has been consistently found to be a highly transformative use. Let me understand this. One of the arguments that we said, I hear your adversary making, and certainly is one that I want to hear your response to, is the notion that something would be a preamble purpose, perhaps, and certainly move in the direction of being transformative if it is a comment on the original work itself, as in this funeral video clip, and that that is a necessary condition for that, for it to be a preamble purpose and certainly to move in the direction of being transformative. I take it you disagree with that, and if so, what's the foundation for your disagreement? Targeting is indeed not required. The court in Warhol said so in footnote 21, said targeting is not always required. The I can do it better, and certainly in this case, the creators of the documentary did more than say I can do it better. They used the clip as raw materials to create new expression, a new documentary. The court cited Google versus Oracle and Authors Guild versus Google. Neither of those cases involved targeting. This I want to stress, because I think it's very important, in footnote 12 of the Warhol opinion, Justice Sotomayor suggested that the result in that case might have been different if Warhol's orange prints appeared in an art magazine alongside an article about Warhol. That example is not targeting. That's an article about use of orange prints in an article about Warhol. That's what we have here. You have the use of the funeral video in a documentary about Joe Exotic and his world. Footnote 12, certainly it's a hypothetical, but I strongly suggest that there's no targeting. Justices Gorsuch concurrence, talking about a for-profit book commenting on 20th century art, not on Goldsmith's work, 20th century art. That's not targeting. The Campbell's example is another where the target is consumerism. Now, I realize that Justice Sotomayor also said it also targets the original, but those were alternative holdings. Targeting consumerism is not targeting necessarily the label. For all those reasons, targeting is not required. I can't imagine that the court intended to throw out decades of jurisprudence, finding highly transformative uses in documentaries where there was no targeting, where there's no biographical reference. Let me go back to the preamble point for a quick second here. Would it be your view that, Adam, that this is a preamble purpose in the sense that it is commenting on, I mean, the documentary itself, the Tiger King documentary, and particularly that episode, is commenting on Joe Exotic and this big cat world, and that that comment, as opposed to some notion of needing to target or comment on the original work or the copyrighted work, is sufficient? Yes. It's a commentary on Joe Exotic and society, and there's the element of news reporting also. But again, if it's highly transformative, it doesn't have to be a preamble news. See Google versus Oracle were transformative, but that wasn't a preamble news. As I said, I think it's helpful, but not necessary for us to prevail. Let me ask you this. Where do you think the Andy Warhol Foundation, what was the deficiency or deficiencies in their position in Warhol? I mean, why did they lose essentially on the first factor of their use, so that I can understand how that maps or does not map onto this situation? They lost for three reasons, none of which applies here. They lost, number one, because Goldsmith's photograph was intended to be used in magazine articles about Prince, and the Warhol Foundation used basically Goldsmith's photograph modified in a magazine article about Prince. In this case, the documentarians, my clients, used a funeral video for a different purpose, not to commemorate Travis Maldonado, but to create a documentary. So that's different. This panel has already found that the purpose was different. Secondly, Warhol relied on meaning and message, saying it's transformative because, look, I've made these modifications. It's a different meaning and message. That wasn't sufficient. It's relevant, not sufficient. In this case, the documentarians of the Tiger King video didn't merely change the meaning and message of the funeral video. They didn't make a funeral video off. They used it as raw materials to make completely new expression. That new expression was absent, a new work. There was no new work in Warhol. And the third reason is that in Warhol, the Warhol Orange Prince was a substitution, provided a substitute for the Goldsmith work. In this case, in no sense of the world, it's unimaginable that someone wanting to mourn Travis Maldonado's death would buy and watch the documentary instead of looking at the funeral video. So for those three reasons, really the examples are diametrically opposed. You have new expression here, a completely different purpose, and no substitution. Counsel, in your opinion, how important is the substitute issue in this case? Assuming you're right, the fact that the documentary is not a substitute for the funeral video, how important is that under the Warhol analysis at least? Your Honor, I think it's, under the first chapter, I think it's dispositive. Warhol, I think, or I may be quoting, said that the substitution was the benoir, I may have that wrong, under the first factor. And so I think when there's no substitution, and there is certainly physical transformation in the making of new expression, not only a new meaning and message, a new expression, I think it's dispositive that there's no substitution under the first factor. I think that's what Warhol was about. If you look at Warhol, what they did was they said, look, here there's a substitution, and let's look and see. That's when they looked at targeting, once they determined there's a possibility of substitution. And they said, well, Warhol only said you could make it better. Here, there's no possibility of substitution. So you can get there, and my clients did far more than say I can make it better. They took a little clip, and they made a seven-episode documentary series out of it. Okay, let me ask you another question. So when we're looking at this, are we comparing the documentary to the entire funeral clip, the entire funeral video, or are we comparing the documentary to the clip from the funeral? Are we only comparing a piece of the documentary to a piece of the funeral video? I mean, what are we comparing? What are we looking at to see if we have a substitute? You are looking at whether both, whether the replaces the funeral video with Dustin, but you can also look at the clip, and that short clip doesn't replace the entire funeral either, because rather than mourning Travis Maldonado in the clip, it's really criticizing Joe and kind of criticizing what's happening at the funeral. If you look at the entire funeral video, it's still on YouTube, but there are many poignant things, even from Jones, quoting from the Bible. So there's no substitution either in the entire video or in the clip. I know, but I guess my... So tell me what your position would be on the best rule of law. What are we comparing? Is it the whole video to the whole video, or is it the whole documentary to a piece? I mean, what are we comparing? You can compare the use of the funeral video clip, what that shows, to the entire funeral video. And criticism, as this court has actually already found in the panel, criticism of Joe Exotic, you know, for the broader picture, it's not the same as mourning Travis Maldonado and not a documentary. Let me follow up on that. If I understood you correctly, you said that you would compare the use of the video clip to the use of the entire video, as in the funeral video that was shot by Mr. Seffi, right? Right. Okay. Okay. Let me phrase a different sort of notion. Should we be looking at the documentary and evaluating how the documentary... Well, should we be looking at episode five, or should we be looking at the documentary and trying to assess whether it is a transformative use? I mean, and part of the reason I asked that question is some of the documentary cases, and I think of the Baltimore Ravens case in particular, and some of those other cases, talk about the notion of whether the copyrighted work is an insignificant or insubstantial piece of the whole. And what I would like to understand here is, what is the whole for purposes of conducting that analysis? Would it be the full season one of Tiger King, or would it be the episode five where the funeral video clip appears? Well, I think it would be the entire documentary, because the clip serves a purpose of telling the narrative starting from day one. Joe Exotic is violent. He seems like kind of a court jester, and then tragedy happens. But even if you look at the episode five itself, that funeral clip tells the story of Travis. You see Travis complaining and upset. And I will say, I see my time is up, but I will add that most of the cases, Campbell v. Acuff-Rose, and Google, and Bill Graham Archives, and SOFA, didn't involve de minimis uses. They involved significant uses. Mr. Rothstein, we have decided amongst ourselves that we're here to get to the bottom of this, and so within reason, you can continue on in answering these questions, and we're going to treat your opposing counsel in the same way. And so, if there are any other questions from the panel right now, you can fire away. Otherwise, I'll keep firing. Thank you, your honor. I did hope to have some rebuttal, but- And you can add that too. Thank you. Well, Ben, let me fire away then. And one of the things that I particularly want to get to the bottom of is this question in Warhol of justification. And that phrase has been used quite a bit, and it may play in that case. It may play on something that I thought I heard you say to Judge Carson, which is that one began to look at the question of targeting because there was the possibility of substitution as it related to the Andy Warhol Foundation use of the print and Goldsmiths. So, what I want to understand from you, Warhol speaks of justification used in a broad sense as relating to furthering the purposes of copyright, and then it says used in a narrow sense in the sense of reasonably necessary to achieve the user's purpose. And this concept of justification apparently is important. This grinder in the A circuit says that the whole question of transformativeness turns on justification. So, the answer to the question, the short version of the How does justification relate to this case and help me by juxtaposing how it related to Warhol? In Warhol, the justification was, I think, put in footnote 21 by Justice Sotomayor, I can make it better. That was justification. Andy Warhol was going to take this photograph, and he was going to silkscreen it and make it better. And that wasn't a sufficient justification. And that's why some kind of targeting is necessary. Targeting can be a justification in that case. In the instant case, the justification is clear. It is to further the narrative of the Tiger King, his life, his dark world, his culture of violence that spirals down. If you look at the beginning of episode five, you see Travis starting to fall apart, and he unfortunately takes his own life. And the funeral excerpt shows Joe's exotic really indifference to this. And later, if you keep watching, you have more of Travis Maldonado's mother saying that Joe was with Dylan Passage just a couple of months later. So, the justification here, as it is with all biographical reference works, is to tell the story. And this really would critically help tell the story of the funeral clip by showing how Joe behaved at that funeral. That's much more than, I can do it better. If our clients would try to make a funeral video and change the music or something, that would make the funeral video at all. And fitting it within sort of the framework of the analysis in Warhol, it would seem to me that what I hear you saying anyway is that this justification, this sort of documentary justification, is in line with the broad purpose of justification that the court speaks of. In other words, furthering the goals of copyright. Would you agree with that? I would agree with that, and I think Google versus Oracle supports that. No targeting there, but the justification for using a tremendous amount of Oracle software was to allow interoperability and then basically do for society and create a brand new copyrighted work, new expression. And that's exactly what happened here. It didn't happen in Warhol. Warhol didn't create anything very new. Goldsmith was still intact. Anything else from the panel? All right. For the moment, we'll let you sit down, or figuratively anyway, and we'll hear from opposing counsel. Good morning, Your Honors. Can everyone hear me okay? Yes. Wonderful. Thank you. Gregory Keenan of the Digital Justice Foundation, appearing on behalf of appellant respondents, White Monkey Productions, and Mr. Timothy Sepe. Warhol teaches us that we have to focus on the specific use, and here that's Netflix's commercial streaming use. A highly commercial use, streaming to millions of paying customers on Netflix's for-profit paywall platform. And critically, Netflix made this commercial use, and this commercial exploitation, without paying the customary license. And that matters. It matters for the logic and the policy concerns that the Copyright Act is balancing. If I may, let me understand one point as it relates to this whole commercial use dimension. Would you agree that the case law seems to suggest that commerciality is not dispositive, I mean, it has to be balanced with the transformativeness of the item in question. Would you agree with that? Yes. I would agree with the caveat that Warhol kind of, I would say, re-injected fervor into that commerciality consideration, so that it does have to be balanced. And I would say that tracing all the way back to Harper, and then reiterated in even documentary cases, like Elvis, a crucial consideration is whether or not the use could have been made by paying a customary fee for that use. And that's... Go ahead, I'm sorry. I'm sorry. That's because it's trying, that strikes the balance Your Honor is looking for. Harper stressed that fair use should not be used to deprive a copyright owner of their right in their property at the very moment when they encounter those users who could afford to pay for that use. And Warhol stressed that it wouldn't impoverish our world if the defendant there had to pay Goldsmith a fraction of the proceeds from its commercial exploitation and reuse. What if you had a Yoko Ono situation where she says, no, I don't like the purpose of your film, and I'm not going to help. Or someone could just charge an exorbitant amount, or could say, you can use it only if I have the right to edit what you do in that regard. What's the solution in that circumstance? Yes, Your Honor. I think at the Supreme Court level, that's an underdetermined question, and it's an important question. One might be tempted to look at that as this type of justification, a situation where someone is preventing the use of another work in that way. But at the same time, Warhol is pretty clear that we need to be responsive to the derivative rights that a user does have to license or not license. The issue in Warhol was, and the court makes it very clear, that drawing the line between a fair use and a derivative use is the whole point here. It's a difficult thing to measure. But doesn't the case law, at least up to now, suggest that it doesn't matter whether the person would take a small fee or not? That is not an important factor in determining whether it's fair use. Where it does come into play, where you have a more wealthy user, then the wealthy user may decide, I will offer them something just to avoid any litigation and problems with it. Could you respond to that if you would? Sure. I actually think it goes deeper than just that last point. Warhol stresses we have to focus on the specific use. In footnote 10, for example, it draws this distinction between the making use, the making of the silkscreen, and the commercial licensing. We have to look at the specific use and the commercial nature of it to understand whether or not there is an existing licensing market where this use, the very specific use, could be done for the customary fee. In Your Honor's example where Yoko Ono is being intransigent and there's no price high enough for her to relinquish to the world, that might be useful to look at compared to, well, is there a customary licensing fee that this use could have been accomplished under? If she is not agreeing to that customary fee, then perhaps that's a consideration of justification. However, in this case, Ms. Recepi wasn't offered the customary fee. The record is replete with customary fees for these uses. Importantly, that's important to the Copyright Act's balance about rewarding creators of the raw materials and the users of the raw materials because there's nothing here to suggest that if Ms. Recepi had been offered and accepted the same customary fee for this use that's extended to other people that that would disrupt the Tiger King from being made or being distributed. There have been a couple of cases. I think the language of Justice Sotomayor appeared very similarly in a circuit opinion, I can't remember which one, saying the world won't be injured if the user has to pay a fee. But that was, as far as I can tell, victim. Are there any cases where this fact that they could afford to pay the fee actually made a difference in whether the court determined that it was a fair use or not? I'd say Harper's discussion about whether or not the use could have been accomplished for the same fee, and critically Harper was a meat and potatoes preamble use, still news reporting on a presidential memoir. The court was still concerned with whether or not the use could have been accomplished for the customary fee. The Elvis case from the Ninth Circuit, which is a biography documentary case involving Elvis, said that that focus, whether or not one is commercially exploiting without paying the customary fee for that use, is the crux of the commerciality focus. And Warhol tells us we have to really examine the commerciality focus, including with an eye for derivative uses, out of respect for the statute's balancing of derivative rights. And I would just say the fact that Netflix is already using these licensing fees, these clip licensing fees, and the record shows that providing clip licenses at a modest amount, everyone wins. The raw material makers are incentivized to make the raw materials. It actually facilitates Netflix from distributing and making these types of works. So that's the logic, I would say, and the policy decisions and policy wisdom of the Copyright Act. Well, let me read you something from the Warhol opinion and see if my take on this is correct. I'll read the quote, but it's my understanding that this is the way to determine whether it's satisfies the first prong of the Fair Use Test. The quote is, whether a use shares the purpose or character of an original work or instead has a further purpose or different character. It says that's a matter of degree, but is that the test? Do you agree that that's the basic test for the first prong? If I remember the quote correctly, and please do correct me if I'm misremembering it, I think it's a matter of degree that then has to be balanced against commerciality. I think it was the next sentence. The answer would be, if you account for the commerciality, yes. Well, those aren't blended inquiries. You're determining whether something's transformative, and then you balance it against commerciality, right? Oh, I'm sorry. I understand now. Yes, but when the Bete Noire, the substitute problem that we're concerned with in the respect for the derivative rights, Campbell talks about not just substitute of the original, but also substitute in the form of potentially licensable derivative works. So when we're looking at something, whether or not it's justified, I would compare it to, for example, Google, where it's an interoperability case. The justification that has to be balanced against the commerciality is whether or not that use is even possible if they don't make use of that work. So the Supreme Court permitted that use in Google, said there was a justification, and arguably that wasn't a targeting justification. Arguably? In what sense was it targeting? There was no targeting in Google. I'll concede then that it is not targeting, but what the court was concerned with was that use could not be made if you didn't interact with the other work. So Google kind of actually dovetails nicely with Campbell. In Campbell, the Supreme Court drew a distinction, reiterated in Warhol, between a satire and a parody, and the nuance, the Campbell nuance, as Warhol calls it, is one cannot even make a parody unless it sufficiently invokes or references the original work. So that justification is one of necessity. Same in Google, which is a technology case, but involving interoperability, you kind of have to copy enough of the code for the two works or technologies to speak to each other. You can't make that use if you're not invoking the other work. In Campbell, was it not a case that you had essentially the same purpose at play, same or similar purpose, which created an analogy in some ways to Warhol? In that situation, because it was the same or similar purpose, there was the search for the independent justification that would allow for it, and they found that justification in the parody purpose. Well, I think the argument that your opposing counsel would make is there is not the same or similar purpose here, that you have a documentary that uses a clip of the funeral video and is engaged in an entirely different purpose. Hence, why the need for targeting? Hence, why the need for an independent justification? It's embedded in what they're doing. Well, of course it's, but that would be true, Your Honor. Let's take, for example, a translation of a book, right, that features some of the original. Of course, I would have to take enough to translate. We would still consider that within the ambit of the derivative right. Just because I want to use it, it wouldn't make it a necessary use. So I think the really important distinction being drawn in the case law for justification or non-targeting justifications is between necessity and convenience, or what Campbell calls avoiding the drudgery of creating something new. And then what do you do with this legion of documentary cases that we've been cited and that I consumed a good number of those, which there was no necessity for that. And let's use, for example, the Elvis case that you pointed out. No, there were two things going on in Elvis. Some things were determined to be fair use, and they were little clips that were activities that, and they were small activity clips, but they were clips that were used. It was only the court found when they used so much of it, that it could be deemed the same purpose as entertainment, as the archival Elvis footage, that there was a problem. So it's not like there weren't any clips that were used, and it wasn't like there weren't any clips used out of convenience. There was no necessity, was there, to use those smaller clips? The smaller clips, no, but my understanding of Elvis is that turned on the commentary and use to comment on the original work. For example, interviews that were providing context about where that fit into Elvis's career. So there was comment on Elvis, right? I mean, and not necessarily on the original work, was it? Well, I think Warhol makes clear that targeting or commenting, sorry, on a person, a persona, character, in fact, a series of cases makes clear is not enough. So Elvis found some uses not transformative or sufficiently justified, even though obviously it was talking about the in Warhol prints and in Harper. Of course, Gerald Ford is a historical person. It didn't turn on those comments on those characters. That's not enough. I'd also just like to stress, it's not about the subjective purpose of the subsequent user. And to ignore whether or not it's truly essential to make this use would upset the delicate balance that copyright is drawing in Warhol, that it's talking about in Harper, about being able to incentivize those who provide the materials. Let me pursue what the chief judge has been asking about. First, I just looked at the Warhol opinion to see about the quoted language. I don't see anything about a commerciality in the next sentence or the next few sentences. Maybe it comes another page later, but I don't think that's what they were talking about balancing at that time. But the basis of my trying to get some agreement on this, and maybe you don't agree with me, but it seems to me that what I quoted was whether it has a further purpose or different character. And that's what I like to pursue in the context of, say, what's called the documentary. And I fully agree with your statement that the label doesn't matter. If you decided to publish all the Beatles songs in chronological order and say, this is a documentary on how their work has developed, you wouldn't get anywhere. No court is going to say, oh, that's a documentary, so it's fair use. But in general, when we think of documentaries, we think of something that takes a bunch of snippets, really, about subjects and puts them together with commentary and editing and so on to help you understand what's going on. And isn't that what happened here? The Netflix series, this is a little difficult for me because I have no interest in this, but it's to show his character, how it's developed, what's going on. And when that's the purpose, then it informs every little snippet. When you know the relationship between Joe and Travis, was that his name, the one who, yes, Joe and Travis, then you understand that snippet from the funeral better. And the snippet from the funeral helps you understand Joe better. And that seems to me to be the essence of what's going on in any documentary. And isn't that a sufficiently further purpose or different character to conclude that this is fair use? What's different about this and the typical documentary that is considered to be able to use snippets as fair use? Tell me that, yeah. Three answers. So, first of all, I think this gets to what the distinction between a broad justification and a specific justification means. So, perhaps there is the broad justification that biographies or documentaries do have to invoke some things. Elvis itself kind of said, you can't make an Elvis documentary without taking something. The question then was, well, what are you allowed to take and how? And I would just point to Warhol footnote four and Warhol footnote 10, because it's talking about how specific the inquiry gets. So, in footnote 10, it's talking about the distinction between the commercial licensing use and the commercial making use. In footnote four, it's talking about a book review that quotes a bunch of passages. And it says that we have to actually justify each specific use so I'd just like to focus on, is it necessary for Netflix to commercially stream in order to do that? I don't know that it is without paying a customary fee to do that. There's a licensing agreement with every other person for whom they're making this use. So, it's not justified to do this without paying that customary price and it wouldn't be profoundly disruptive for Netflix's streaming purposes. So, that might be different, for example, than- The same documentary, if it was on film and showed at little theaters around the country, then it would be fair use? It would be a different analysis. It wouldn't be technology dependent, but it would be about the commerciality. So, take a- I thought that was a wonderful quote from Samuel Johnson. I was surprised to see that quote that anyone who writes without being paid is an idiot or something along those lines. That surprised me from him anyway. But all this stuff has commercial- the preamble uses are all commercial uses in general. You're really focusing totally on, hey, we've got a really rich user and they ought to pay us a little bit. That seems to be the thrust of your argument, because everything else that goes into determining fair use seems irrelevant in your approach. Because that's what you always come back to. No, it's not irrelevant. Sorry, Your Honor. No, certainly not irrelevant. It's very important. It's just that Warhol makes clear that if there is no targeting and not targeting of the characters, targeting of the work itself, then we're at Campbell's lowest ebb and it requires serious justification. No, it was saying targeting or some other further use or purpose. And wasn't that search for a justification because the purposes themselves were the same or similar. The purpose in Campbell was the same as what Roy Orbison did. The purpose in Warhol was the same as Ms. Goldstein did. It was the same purpose. The argument here is it is not the same purpose, that they created a documentary that profiles Joe Exotic's Megalomania, not a funeral video about remembrance, which in fact, in our panel decision, we said that distinction exists. So, if it is not the same purpose, why the need for the same justification, this search for this independent justification of targeting that was in Warhol and that was in Campbell? Why is that necessary here? The targeting is not necessary. That's not our position. So, I'm sorry if I... Oh, in your briefs, it's fairly clear that that's what you've been saying, that it does need, there needs to be targeting. That's all through your briefs. Sorry, I would point to the section, I don't believe so. We have a section where we list three separate justifications, such as the orphan work problem, that a documentary where, so it's an orphan work problem. It's widely recognized in copyright. This is a situation where you literally cannot locate the rights holder because it's been out of print for so long. There's no way to, which I think goes back to the Yoko Ono example, that might provide a justification that has nothing to do with targeting. So, we provided a documentary specific, I believe we did four examples. Why is that? The point is, why is that necessary? Why is it necessary? Indeed, in Elvis, it wasn't necessary for the snippets that they used. It wasn't necessary in the Baltimore Ravens cases. When they found fair use, it was not necessary. They had little clips that were profiled in their Hall of Fame or wherever it was. It wasn't necessary. In fact, so why is necessity the operative principle if the use, the challenge use is different? I would point, for example, to the Supreme Court's Google example. So, the reason there's a justification there is that you need to make the use, just like Campbell, but it's not targeting, but you need to make the use in order to do the work. And that respects Campbell's insistence that what we're concerned with is substitution, not just of the original, but also of potentially licensed derivative uses. Does Campbell set the floor? I mean, does it have to be a necessity, as in Campbell, for there to be a use of a snippet in a documentary? Where there are clip licensing agreements and that is a customary practice and customary use that incentivizes creation of those clips and rewards that? I mean, to say that this is a fair use, it's not just going to stiff our client. It would eviscerate those licenses. Why would anyone pay a license for these types of use if just throwing it in a montage or a documentary is enough? Well, let's go back then to the example in Warhol that Justice Gorsuch gave about putting that same print in a book on 20th Century Art. Nobody's going to pay that person in that situation. They said the potential for it to be fair use was to come from the fact that the overall objective was a different purpose of a different character. There was no payment going on in that situation. He said he didn't definitively say it would be fair use, but he said it was militated in the direction of fair use. So there was no necessity to use the print from Warhol in such a hypothetical book. But of course, there's no... I would say that that example, first of all, and I understand it, but it is a concurrence and it doesn't... I don't know whether or not there's a licensing market for those uses. That would be an evidentiary question. So I understand what Justice Gorsuch said. I thought Justice Sotomayor, in a footnote, had a very similar sort of hypothetical that she talked about. And in both instances, the question was whether the character and purpose overall was different. And therefore, what necessity would there need to be for an independent justification, which was a term that Justice Sotomayor used in Warhol, independent justification. Why would there be a need for one if there was the same or different purpose? Because I think that language, while I understand the term justification is a little amorphous, it's talking both about at a broad level, which I think your honors are speaking about, and at a very specific level. And then Warhol further reiterates in footnote 10, that it's very specific. So you have to do it use by use. So just saying, what might be a justification for someone making a documentary, but not streaming it publicly, is a very different question than the commercial streaming. So in Warhol, for example, they said there's a bunch of uses going on. The specific use we're concerned with is the commercial licensing. So I just think the justification at the making stage and the streaming stage is very different. The justification for the need to use it is going down as the commerciality is going drastically up. So I think the justification and the balancing that has to be done between the transformation or the justification and the commerciality has to be evaluated at each stage and sensitive to each use. And Warhol certainly draws such distinctions that are that fine and razor sharp. And it chastises the dissent for talking too broadly, just saying, well, this work is transformative of this work. In footnote 10 in particular, that's a sleight of hand and it's committing a fallacy of conflating two distinct uses, that it was laser focused on the commercial licensing use. So our only point would be when we're evaluating the commercial streaming use, we have to look at that balance, independent justification, whether or not there's targeting and commerciality at that stage. And we have to say, what is the justification at that stage? Why is it necessary to make this film? Why is it necessary in the way that satire, which doesn't target? It might be socially valuable, but we wouldn't say a satire is justified just because it wants to say something and wants to use someone else's stuff to say it. So we would just stress that it's a matter of the specific level of justification and the specific focus on the particular work and balancing it with the commerciality at that stage, which isn't just going after deep pockets or rich defendants. It's actually looking at what the exploitation of the work is. Well, that's a good point. And let me raise that. In a number of cases, what we're talking about is the courts have said, when we say commerciality, we're talking about exploiting the specific work itself. We're not talking about the overall commerciality of the item, and so how does that help you? Because you've got a snippet, which I did, and my math is horrible, but I'll tell you what. When I did the percentages on this, what we ended up with is that the funeral video clip is 2.5% of episode five, and it is one third of 1% of the entire season one. Now, how is it that Netflix is commercially exploiting the funeral video clip in such a situation? And we're not talking about exploiting Tiger King itself. We're talking about that clip. I would say Harper answers that question. There's a big difference in Harper and what is one third of 1%. And if you look at, and I came up with this analysis, when you look at, I think it was the Baltimore Ravens case, it talks about the notion of insubstantial or insignificant presence. And why isn't that an insignificant or insubstantial presence? Well, it's certainly not insubstantial. First of all, You heard the percentages, and even if I'm wrong in my math, I'm not that wrong. I'm not going to challenge your math. I'm not sure I'd be able to do it much better. I'll take your word for it. But I would say, even withstanding that mathematical percentage, I would revisit Harper with a close examination of the percentages going on there, reexamine the fact that, yes, there is quantitative analysis, but there's also qualitative analysis. That in footnote four of Warhol, they're saying you have to go snippet by snippet in a book review that makes many quotes of the same book. You have to do a quote by quote analysis. And I can't imagine, I don't want to play around with the math because I'd be guessing and I'd be guessing wrong. But my point is, it's qualitatively significant. This is a far cry from an incidental use where something's passing in the background. Like if I'm making a document. Let me stop you for a minute because it seems like this may all play into the idea of whether or not there's a substitute, whether the Netflix documentary is a substitute. Because if it's true that it's such a small portion, I mean, how is the Netflix documentary a substitute? And in that same line of thinking, I mean, what's the shared purpose between the two? That would make the Netflix documentary a substitute. I mean, so you have two things going on. You have the fact that it's such an infinitesimal piece of the Netflix documentary. And then you also have the idea that they don't have the same shared, they don't share a purpose. Unless you can tell me otherwise. So on the infinitesimal, I would just quickly say that the fact that defendants are even licensing such uses and try to license such use that as a functional matter, it's not really de minimis or incidental. I mean, it's a clip license agreement. It's designed to license clips. So in the industry, I mean, particularly in an age of shorter retention spans and anyone who's ever used TikTok or anything like that, I mean, you're looking at very quick snippets that are seven seconds long and they capture people's attention. So I think we'd be really speculating to say licensed uses are incidental and de minimis. There's entire copyright clearance teams and licensing agreements around this. Two, it's not fleeting or incidental in the background. It's centrally featured. I mean, it's a whole scene. It may not be a huge part of the whole thing, but you could do that with every scene. You could chop up every scene into smaller and smaller scenes and say, that's not very important. No. I mean, don't you have an issue on the substitution question where, I mean, who is, if I want to take a look at a portion of the funeral, how am I, am I going to go behind Netflix paywall and go search this out because I'll tell you finding it is not easy if you don't know exactly where to look. Am I going to go behind Netflix paywall and pay for it and look for the funeral scene? Or am I just going to go to your client's video for free on YouTube and take a look at it? I just don't see how the Netflix production is a substitute. I appreciate that. And I'll start with the second answer because I think that highlights a great point. So, I'd like to draw a contrast, if I may, and it just brought out, I'll try and do it as fast as possible between, let's say, this type of use where the use is uncredited and behind a paywall. So, millions of people have seen our client's clip. No one knows who our client is. They wouldn't be able to find him. He's not referenced. He's not credited. So, there's an actual real-world effect that that has because people aren't going to see him. They don't know who he is. By contrast, take a YouTube reaction video, right? There, you're watching something. It's commenting on the original video. But typically, it's telling you what that video is. It's crediting it. And typically, it's freely available right in the kind of recommendation page on the right. So, taking some... So, how about this? How about this? If I've seen the Travis Maldonado funeral clip in the Tiger King or somewhere else, and I want to see it again, and I type in the search term on Google or wherever, the funeral video is going to be one of the top choices that pops up, isn't it? The actual funeral video, your client's video is one that's going to pop up, and it's going to be readily available to me. It's a great question. I honestly don't know. I know. I know, because I did it. Okay. But that's extra record, and I'm not... I'm just saying. There are... It takes you places when you look for this. So, your idea that there's no attribution, so nobody would know where to find it, I mean, you just type in a search term, and it gives you a lot of opportunities to view it. I'm not familiar with the particular search terms one would have to use. I haven't done them myself. I understand the concern. I'm not saying that no one would ever find it. I'm just saying, naturally, if you take someone else's work, particularly if you're claiming you're being a historian, putting the source and referencing it would minimize the adverse harm on the person you're already stiffing to make use of it. I think Warhol does talk about credit and money going back, and I just think that's a matter of kind of common sense that if I... I mean, would you agree? You use the term stiffing a lot. Would you use the... Would you agree with the idea that anybody whose work is the subject of fair use in some instance or another is being stiffed? I mean, they're not getting paid for it. It's their work, so they'd like to get paid for it, but they're not getting paid for it because it's fair use, so they're being stiffed. That's every fair use case. Yes, that is every fair use case, but there's a critical difference there because the question is... I'm not saying he's being stiffed because his work is being used. I'm saying he's being stiffed because others are being paid for the same specific use, which Warhol instructs has to be the focus. So, there's a difference between existing markets, and it's important because it's not just about the client. It's about the incentive structure for the whole ecosystem, right? So, if we say something's a fair use, what we're doing is we're getting rid of those licenses for those uses. So, for example, people put songs in movies as part of a soundtrack. They have to get licenses to do that. If you've ever watched a popular movie, you'll hear a bunch of songs. It's made by a different person. You have to get a license to do that. Someone could call that a harper, and Warhol stressed, at the point that people are making productive social uses and have the ability to pay some portion to the rights holder, that's just copyright incentives working. It's a win-win-win. All boats... Let me ask you. I don't want to belabor this point. You had a chance to talk about that quite a bit. I have one more question. I don't want to test the chief's patience with me for continuing this well past your time. This is a preamble question having to do with commenting. I just want to know, is it your position that the commenting has to be on the clip itself or on your client's video itself, or can the commenting be on a person who's in the clip even if it's unrelated to the subject of the clip? Does that make sense? It makes sense. I have a very precise answer. Because there's no presumption in favor of preambles, you would still have to do the exact same justification analysis. Totally agree, but that's not responsive. I want to know if you see a distinction in those two. Can the second type of commenting, which is commenting on a person in the clip, but the comment is unrelated to the clip, is that commenting for purposes of the preamble, or is that not commenting? I would say it's not commenting because it would have to target in the sense of conjuring up the original. You view commenting and targeting as related. I would say that the Brammer case and its discussion of scholarly and commentary, it talks about providing commentary on the work itself. That would be the Fourth Circuit making that connection. I also think it's important that when we're looking at, for example, book reviews that are using raw materials, Warhol talks about conjuring up the original work to shed light on the work itself, not just the subject of that work. We would say that the type of specific justification, even for the commenting in the preamble use, that yes, it would have to be discussing the work itself in the way that Brammer discusses. Thank you. Thank you. Anything further? Could I make one response to Judge Carson's earlier question that I didn't get to answer? We're at 22 plus. It better be quick. Go ahead. Say it. Just ask you to look at footnote 4 of Warhol regarding whether you have to do the work as a whole or not. Then regarding substitution, it's not just the original, but also the substitution of a derivative, potentially licensable use. We would just point to Campbell's discussion of that as a basis for thank you very much for your time and attention today. I really appreciate it. Robert, why don't you start, if you would, giving rebuttal of 10 minutes. You don't need to use it, Mr. Rothstein, but if you want it, that is what we'll view as the ceiling now. You have your rebuttal time, please. Thank you, Your Honor. Let me start, if I may. I suspect this is something you want to go in. I didn't ask any questions before, but in terms of what Mr. Keenan said, and perhaps I should preface this by saying you might be confused about what's going on here. I can only speak for myself, but I was fully on board with the panel opinion. No one forced me to join that. I thought it was a great opinion and I was pleased to join it. One thing that's great about this court is we want to make sure we've pursued everything and make sure we didn't miss something. There's something in the hearing briefs that made us, at least me, think that it'd be worthwhile pursuing some more things. The one thing Mr. Keenan has mentioned frequently is the market for paying people whose works are used in part in a Netflix documentary. Apparently, a lot of people were paid for the clips that were used in the Tiger King documentary. Tell me what's going on there. If we ruin your favor in this case, does that mean you're never going to pay anybody anything anymore? What's going on? It may not be a legal issue, but it's a gut issue that why pay these people and not others? What's going on? Yes, I will get to the practical issue. May I start with the legal portion of the licensing? Yes. Google and Oracle negotiated for a license. I can't imagine that Google would not have been able to pay for it. They just thought Oracle was asking too much, and so they went ahead and used it. Also, there was no necessity. They didn't need to use it. The federal circuit actually held that the use wasn't transformative because Google could have done it themselves, just as Marshall's dissent in Google versus Oracle said that Google could have made the software itself. They didn't want it. The majority rejected that, so there's no necessity, and the fact that someone can afford to license doesn't matter. What's going on in licensing, practically? People license for many reasons. One reason they license is so, frankly, they don't have lawsuits that go up to a circuit court and then are reheard, and they have to spend the legal fees. It's much less expensive to pay, even though they might not have to pay to avoid litigation. The second thing that happens when we're talking about licensing, we're talking about licensing of long portions of films, not necessarily just excerpts of films. It wouldn't be different if we used the whole funeral video and played it from beginning to end. That, I would say, I think, would have required a license. We paid for that. License gives you a chance to use more than you can in connection with fair use, but it's not required. Again, Google just didn't want to pay, and yet it was fair use. Jeff Shartz, can I play off of that comment for a quick second? On the notion of whether snippets would be something—well, you talked about the idea that if you had used more of it, it might be the case that you would have to pay. It seems to me that that aligns with what went on in Elvis, where essentially they used snippets. They didn't pay for that. When they decided to use larger portions that conceivably could have entertainment value, that changed the analysis, right? Right, the substitution. If it's substitutive, if that's a word, it's more likely that it's not fair use, and you have to pay. Paying a license gives you the right to substitute and exploit a work commercially. Let me ask you this question. This goes back to my endeavor at percentage analysis. On that point, I don't recall you taking a position as to whether you thought this was an insignificant or insubstantial use. That's the language of both the Baltimore Ravens cases and Bill Graham. That's where this percentage analysis stuff comes from. I don't recall in your briefing that you took a position to say that, you know, this is really an insignificant use, and therefore it's not the kind of thing that really, either those cases or Elvis, would be something that I would be in the licensing business to pay for, that I would have to pay for. I think it clearly is an insubstantial use. I think your honor still held the panel in connection with the third factor. I will make a distinction. The Baltimore Ravens, I think they said de minimis use. Well, no. Whether they used that or not, both in Bill Graham and in Baltimore Ravens, what we're talking about, and I think in Bill Graham, they said that there's a question as it relates to the third factor, but they also thought that it played on the first factor because it was telling on the substitution issue. You know, it was telling on the question of whether you were really trying to use it beyond as a sort of snippet for something. This clearly is an insubstantial use under that. I mean, Bill Graham, they used the entire posters, you know, the whole work, and still they found that was insubstantial. It follows up Horace that our use of the short clip with interstitial material is insubstantial. So, absolutely, I think this case is an easier case to find transformative use than Bill Graham because they used quite a few, you know, the entire posters, not attenuated at all. And, again, the lack of substantiality, if you will, leads to the fact that there's no substitution, and use is transformative. What do you understand the Warhol decision to mean when it speaks of the Campbell nuance? What is your sense of what that means? I don't remember the context of those words, Your Honor. I apologize. That's okay. I don't, I won't have you pursue it, but it comes up in connection with the principal opinion responding to the dissent and explaining what the dissent does not, is not considering. And one thing that it purportedly is not considering is the, quote, Campbell nuance. And, like I said, I don't want to belabor that or eat up your time. We can, I can, I can read. So, I'll follow up on that. Go ahead. Okay. I also want to talk, mention this again about, well, it could have been licensed. I mean, this case has, I don't want to overstate it, but shorthand, it's got a bit of a Yoko Ono flavor. This isn't a situation where my clients knew about Tim Seppi. The only thing in the record is they asked him about film clips because he was helping provide them. And after he left the park, he said, oh, you'll have to talk to Joe. He didn't say, I own those film clips or any of those film clips are mine. And later they asked him to do some work and he even offered to pay him a fee. And he didn't say, I'm going to pay. So, this is not a situation where- That's in the record. Is that right? And it's in the record. So, it's clear, it's not a situation where my clients knew that Tim Seppi took the funeral video and used it anyway. They didn't. They didn't. In fact, they probably, I think they thought they licensed it from Joe Exotic. Not that they had the license to clip, but in the abundance of caution as they do in Hollywood. Finally, I think I heard Mr. Keenan say that, in fact, the use of the clip of the funeral video in the documentary was a broad use. Well, if that's so, this case is over because it's clear from Warhol that the majority thought a broad fair use is transformative in and of itself. And certainly there was a broad transformative use in Google versus Oracle. So, I think going back to concluding with Judge Hartz's comment, there's no question that the use of the excerpt from the funeral video had a further purpose and character. It added not only additional meaning and message, it created a new expressive work and it couldn't possibly, neither the clip nor the documentary itself could possibly substitute for the original. Therefore, under the first factor, highly transformative. Let me hear your response to something that's in this oral argument and the other about these YouTube reaction videos. And the idea was that in some sense, in that context, this lacked the notion of identification and targeting on that was present in the YouTube reaction videos. I may be butchering some of what Mr. Keenan said, but I mean, essentially the question that this is, it was allowable in that context, but you don't follow those same rules here and therefore the problem exists on fair use. Yeah, I'm not sure I understand the point because reaction videos seem to show the entire work. They're not necessarily commenting on the original because I understand that they're really commenting on the individuals who are doing the reacting. I will say that the argument that, well, this is commercial streaming and that's the use that should be addressed under Warhol, if that were the case, then Campbell would have come out the other way because in both works, they were for records and concerts and radio and in Google, software were both for devices. That's a valid point. Let me, in the sense that you're drawing a distinction, I want to make sure I understand. I think I did hear Mr. Keenan speak of this as being a commercial streaming as being the use. I take it your position is that is not the use, then what is the use? What is the challenge used to use Justice Gorsuch's terminology? Okay. As in Warhol, the challenge use was use of a photograph or image of prints for a magazine article about prints. What is the challenge use here, I'm saying? Challenge use here is use of a brief excerpt from a funeral video to criticize Joe Exotic for the larger purpose of telling Joe Exotic's story, the tragedy that is Joe Exotic and maybe the people around him. That's the use, completely different from the panel held the use of funeral videos. All right. Judge Hart, you look like you want to ask a question. I've been enjoying your questions. All right. Council cannot say they were not heard. We will end at that. Thank you for your fine arguments. We are adjourned.